IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALPHONSO GOINS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. _____ |
| | § | |
| UNION PACIFIC RAILROAD COMPANY | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S ORIGINAL SWORN COMPLAINT

Plaintiff Alphonso Goins ("Plaintiff" or "Goins"), files his Original Sworn Complaint against Defendant Union Pacific Railroad Company ("UP" or "Defendant"), showing the Court as follows:

1.      On March 28, 2025, UP terminated Goins's employment in retaliation for his protected conduct under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Accordingly, Goins brings this FRSA retaliation lawsuit to recover damages from UP.

## THE PARTIES AND JURISDICTION

2.      The Plaintiff, Alphonso Goins, is a natural person residing in San Antonio, Texas. Goins has standing to file this lawsuit.

3.      Defendant Union Pacific Railroad Company is a foreign, for-profit corporation that may be served with process via its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

4.      The Court has personal jurisdiction over Defendant based on both general and specific jurisdiction.

5.      The Court has subject matter jurisdiction over this case based on federal question jurisdiction, specifically the FRSA.

**FACTUAL BACKGROUND**

**A. Goins Moved From North Carolina To Texas To Take A Life-Changing Job With UP**

6.      In November 2024, Goins was hired by UP to be a Conductor.  UP is a large railroad carrier, covering 23 states across the western two-thirds of the United States of America. It has more than 30,000 employees.

7.      Goins moved from North Carolina to San Antonio, Texas, for the job with UP.  The job offered Goins the opportunity to change the entire financial trajectory of his life.  Once he was a Conductor, he was expected to earn between $100,000 to $120,000 his first year and $150,000 to $200,000 a year after that.  That is far more than any job he had previously held in his life.

8.      Goins first had to complete training.  The training was in San Antonio, Texas.  It began on or about February 17, 2025.  During training, he was paid $289 a day and reported from 11 p.m. to 7 a.m.

**B. In Early March 2025, Goins Engaged In FRSA-Protected Activities**

9.      During the shift that started at 11:00 p.m. on March 6, 2025, Samuel Allen, an employee with UP who was helping to train Goins and his classmates, instructed Goins in front of approximately three other UP employees to conduct an air test on a UP locomotive.  The locomotive was actively in use by UP.  During his classroom training, Goins had been trained by UP on the proper process to follow to conduct an air test in compliance with what UP represented to be its policies and Federal Railroad Administration ("FRA") regulations.  *See, e.g.,* 49 C.F.R. §§ 229.29, 232.201-219.  That process included multiple specific steps (UP Trombone Air Test Instructions, Ex. 1).  UP itself had emphasized in its training that following all the steps is important because an air test is designed to ensure the locomotive's breaks are in good working

2

order and faulty brakes can cause devastating and deadly accidents. UP itself is painfully aware of these potential consequences.[1]

10.    Contrary to the multi-specific step process called for by UP and federal regulations, Allen instructed Goins to skip the first four steps. Doing so would violate what UP had told Goins was its policies and FRA regulations and render the locomotive a threat to public health and safety. It would also subject Goins to civil and criminal penalties according to the training he had received from UP and federal law. *See, e.g.,* 49 C.F.R. § 229.7 (providing that "[a]ny person who knowingly and willfully falsifies a record or report required by this part is subject to criminal penalties under 49 U.S.C. 21311."). Accordingly, Goins told Allen in good faith that he would not skip the first four steps of conducting a proper air test and that to do so would be contrary to UP policy. Goins pulled out the instruction book UP had given him and showed Allen the multi-specific step process UP required (UP Trombone Air Test Instructions, Ex. 1). Allen then tried to argue the point with Goins, by telling him the first four steps were unnecessary and were just making more work for himself. Goins refused to yield to Allen's instructions to skip the first four steps for the air test, because that would violate what UP had told Goins was its policies and federal regulations and render the locomotive a threat to public health and safety. Goins was professional and non-threatening throughout his exchange with Allen. Nevertheless, Allen was upset at Goins and ordered him to go home for the rest of the day, which Goins did.

11.    At 8:43 a.m. on March 7, 2025, Goins called Cornelius Knox, Technical Training Instructor, who was his primary instructor, and is in management with UP. Knox had supervisory

---

[1]    https://www.trains.com/trn/news-reviews/news-wire/ntsb-brake-and-end-of-train-device-problems-led-to-deadly-sherman-hill-runaway-updated/ (reporting on an accident in which two UP employees were killed and stating: "[h]ad Union Pacific followed the rules and conducted air brake tests, any defects would likely have been identified and this accident could have been prevented," Robert Hall, NTSB director of the Office of Railroad, Pipeline and Hazardous Materials Investigations, said in a statement.'").

authority over Goins. Knox also had authority to investigate or address Allen's misconduct. Acting in good faith, Goins told Knox what had happened with Allen. Knox, who is a former Conductor at UP, said that Goins did the right thing by following the book. He said next time if anything like that happened, to call him (Knox) immediately.

12.     At 9:00 a.m. on March 7, 2025, Dewey [LNU] a trainer for UP, called Goins from 210-422-9466 and was sent to voicemail. Goins saw the incoming call on his cell phone and then called Dewey back himself immediately at 9:01 a.m., before Dewey left a voicemail message. Upon information and belief, Dewey [LNU] had supervisory authority over Goins or had authority to investigate or address Allen's misconduct. Dewey asked Goins about what happened with Allen. In good faith, Goins told him everything. Dewey told Goins he had done the right thing. Dewey told Goins to "always follow the book" and that he would talk to Allen.

13.     The next day, Goins reported to training as usual. During that shift he performed an air test in front of Allen and followed all the above-referenced required steps. Allen told Goins that he was not aware that UP's book (that had been given to Goins in training) stated that all the steps had to be followed.

**C. In Late March 2025, UP Fired Goins In Retaliation For His FRSA-Protected Activities**

14.     By late March 2025, Goins had passed his final examination and was ready to begin actively working as a full time Conductor. At that point, his pay would have risen to $375 a day. As previously noted, he was expected to earn between $100,000 to $120,000 his first year and $150,000 to $200,000 a year after that. Goins had no discipline or any other problems at that point.

15.     With no warning, on March 28, 2025, David Mendez, a manager with UP, called Goins into a meeting and told him to resign. Mendez had supervisory authority over Goins. Mendez also had authority to investigate or address Allen's misconduct. Mendez told Goins that

if he resigned, he could later go to work for another railroad. Mendez told Goins that if he did not resign, and insisted on being terminated, then he would be blacklisted from working for another railroad ever again. Mendez had even prepared a notice of resignation for Goins to sign and gave it to him in hopes he would sign it (Southern Region Employee Separation Notification Notice of Retirement / Resignation / Return to Craft Professional, Ex. 2).

16.    But Goins said he would not resign. In good faith, Goins told Mendez what had happened – i.e., that he had simply told Allen that he would not refuse to follow the specific, multi-step process he had been trained to adhere follow and been told was required to be followed by federal regulations. Goins said he did nothing wrong and therefore would not resign. Because Goins refused to resign, Mendez terminated Goins, claiming that he had been "argumentative" with Allen and was being terminated for that reason. That is false and pretextual. Goins had not been "argumentative" with Allen. Instead, he had simply professionally told Allen that he would not follow his instructions because to do so would violate UP policy and federal regulations.

17.    Cornelius Knox was in the termination meeting too but got up and left after Mendez threatened Goins with being blacklisted if he refused to resign. UP later sent Goins a letter stating that he was terminated effective March 28, 2025 (Termination Letter from UP to Goins of 03/28/2025, Ex. 3). Thus, Goins was fired a mere three weeks after his FRSA-protected conduct. *See supra.*

18.    A classmate of Goins named Jeffrey [LNU] who violated UP's 12 Critical Safety Rules (specifically Rule 3 having to do with Train Movement) was not terminated but instead put on probation.

**D. Promptly After His Termination, Goins Filed An Internal Complaint With UP's Corporate Office And A FRSA Retaliation Complaint With OSHA**

5

19.    After his termination, Goins called UP's Values Hotline to complain about his termination, and was put in touch with Norma Valle, Analyst Corporate Investigations, at UP's headquarters in Omaha, Nebraska. On March 31, 2025, Valle emailed Goins and set up a call with him (Email from Valle to Goins of 03/31/2025, Ex. 4). On the call Goins told Valle what happened. Valle said that Allen lacked the authority to send him home. She also said that Goins's *alleged* violation was not one that UP typically fired someone for the first time it happened, whereas what Jeffrey [LNU] did was one they typically fired someone over the first time it happened.

20.    On Monday, April 7, 2025, through his legal counsel that he had hired that day, Goins filed a timely written FRSA complaint against UP with the Department of Labor – Occupational Safety and Health Administration's ("OSHA") San Antonio Area Office. Goins's lawyer copied Valle on the complaint by email. OSHA assigned it Complaint Number 301052090.

### E. In April 2025, Goins Received Texts From UP Employees That: (1) Effectively Admitted That He Had Been Fired In Retaliation For His FRSA-Protected Activities; And (2) Threatened To Make His Life "A Living Hell"

21.    Four days after his filed his FRSA complaint with OSHA, on Friday, April 11, 2025, Allen texted Goins (Texts from Allen to Goins of 04/11/2025, Ex. 5). Allen admitted what he had done and threatened Goins. Specifically, Allen told Goins:

     a. "I don't care what the book said because everyone knows it's different on the yard." (Texts from Allen to Goins of 04/11/2025, Ex. 5).

     b. "Smh, if you know like I know, you better not come back to this service unit, that's all I have to say." (*Id.*).

     c. "If you try to come back they will make your life a living hell." (*Id.*).

     d. "Even if by some miracle [you] make it back, they are going to make it 100x harder on you." (*Id.*).

6

22.     On April 15, 2025, Cornelius Knox texted Goins (Texts from Knox to Goins of 04/15/2025, Ex. 6). Knox confirmed that Allen knew he had done wrong and told Goins that if he returned to UP he would "have a huge target on [his] back . . . ." Specifically, Knox told Goins:

    a.  "He [Allen] knows he messed up. Your never supposed to skip steps. Especially when you have the book in front of you. [H]e knew better." (Texts from Knox to Goins of 04/15/2025, Ex. 6).

    b.  'I'm just going to be honest with you. If you do get back somehow, you will have a huge target on your back they will look for anything or any reason to fire you." (*Id*.).

23.     On April 22, 2025, Allen texted Goins again (Texts from Allen to Goins of 04/22/2025, Ex. 7). Allen sang a different tune this time. Allen apologized and admitted that what he had instructed Goins to do "went against the FRA regulations." Specifically, Allen stated:

    a.  "I want to apologize. I was unaware of the information your instructor gave to your class to go strictly by the book." (Texts from Allen to Goins of 04/22/2025, Ex. 7).

    b.  "I didn't mean to yell at you that night. I was upset because the way I was showing you to the airbrake test has been the way I have done it for years. I didn't know it went against the FRA regulations." (*Id*.).

24.     On April 23, 2025, Knox texted Goins again (Texts from Knox to Goins of 04/22/2025, Ex. 8). Knox stated:

    a.  "Yeah, Sammy told me he apologized. We have been talking about what happened and I think you may actually win." (Texts from Knox to Goins of 04/22/2025, Ex. 8).

    b.  "Omaha [UP's headquarters] has been asking questions, and it goes back to what I told them after you left the office. I told them that firing you may come back to haunt them because you were treated differently from another student who has a more serious violation." (*Id*.).

25.     On May 12, 2025, Goins received a notice from UP generically stating in form language: "Thank you for bringing your concerns to the Company's attention. Your Values Line report has been investigated and is now closed. The matters identified in the report have been

reviewed. The information obtained during the investigation did not support a determination of a Union Pacific policy or code of conduct violation." (Notice from UP to Goins of 05/22/2025, Ex. 9). UP's "finding" is a bad faith sham designed to try to conceal its unlawful termination of Goins in violation of the FRSA's anti-retaliation provisions. *See infra.*

26.     After Goins's termination on March 28, 2025, he was unemployed for about a month, and then he accepted a job with FGF Bakery in San Antonio earning $13.00 an hour.

27.     On August 27, 2025, a Senior Paralegal employed with UPS at its corporate headquarters in Omaha, Nebraska submitted its Statement of Position ("SOP") to OSHA. Its SOP fails to respond to Goins's detailed factual allegations, ignores the evidence, and is filled with knowingly false statements.

**F.  Goins Has The Right To File This De Novo FRSA Retaliation Suit Now**

28.     49 U.S.C. §20109(d)(3) provides that "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee, the employee may bring an original action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy, and which action shall, at the request of either party to such action, be tried by the court with a jury." More than 210 days have passed since Goins filed his complaint and the Secretary of Labor has not issued a final decision. That delay is not due to any bad faith by Goins. Accordingly, pursuant to 49 U.S.C. §20109(d)(3), Goins brings this de novo action in federal court.

## RETALIATION CLAIM UNDER THE FRSA

**A.  Legal Standards**

29.     The FRSA focuses on promoting safety in the railroad industry. 49 U.S.C. § 20101. Congress later amended the Act to create stronger protections for employees who engage in

whistleblower activities. See Pub. L. No. 110–53, § 1521, 121 Stat. 266 (2007). One such protection prevents railroad carriers such as UP from discriminating or retaliating against an employee who engages in a protected activity. 49 U.S.C. § 20109. Railroad carriers "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done." § 20109(a).

30.    The FRSA lists seven protected activities for which a railroad carrier may not retaliate. 42 U.S.C. § 20109(a)(1)–(7), and two additional provisions prohibiting retaliation for actions related to safety or security conditions or for seeking and receiving medical attention, §§ 20109(b), (c).

31.    One form of protected activity under the FRSA is providing information, directly causing information to be provided, or otherwise directly assisting in any investigation regarding conduct that the employee reasonably believes is a violation of any federal law, rule, or regulation related to railroad safety or security or gross fraud, waste, or abuse of federal grants or other public funds intended to be used for railroad safety or security 42 U.SC. § 20109(a)(1)). Under this subsection, the information must be provided to or the investigation must be conducted by: (1) a federal, state, or local regulatory or law enforcement agency (including an office of Inspector General under the Inspector General Act of 1978); (2) any member or committee of Congress or the Government Accountability Office; or (3) a person with supervisory authority over the employee or authority to investigate, discover, or address the misconduct.    42 U.S.C. § 20109(a)(1)(A)-(C).

9

32.    Another form of protected activity under the FRSA is refusing to violate or assist in the violation of any federal law, rule, or regulation relating to railroad safety or security 42 U.SC. § 20109(a)(2)).

33.    An action brought to enforce the FRSA's anti-retaliation protections "shall be governed by the legal burdens of proof set forth in section 42121(b)."    42 U.S.C. § 20109(d)(2)(A)(i).  The Fifth Circuit U.S. Court of Appeals has described the burden shifting of that statute to require an employee first to establish a *prima facie* case by a preponderance of the evidence that: (1) he had been involved in a protected activity; (2) the employer was aware that the employee had been involved in such an activity; (3) the employee was subjected to an unfavorable personnel action; and (4) the protected activity was a "contributing factor" in that unfavorable personnel action. *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 475–76 (5th Cir. 2008); *see* 42 U.S.C. § 42121(b)(2)(B)(i).

34.    If an employee establishes a *prima facie* case, the burden shifts to the employer to prove the same-action defense.  § 42121(b)(2)(B)(iv).  Under the same-action defense, a railroad carrier has the opportunity to "demonstrate[] by clear and convincing evidence that [it] would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* The employee cannot obtain relief if the employer succeeds in establishing the same-action defense. *Id.*

35.    The FRSA's "contributing factor" causation standard means that the law prohibits retaliation that is "due, in whole or in part," to the employee's engaging in a protected activity. 49 U.S.C. § 20109(a).  The Supreme Court has interpreted similar language as creating liability if the employee's action causes "even the slightest" influence on the employer's decision. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 695–99 (2011) (quoting *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500 (1957)).

**B. Analysis**

36.     As the facts set forth above show:  (1) Goins engaged in FRSA-protected activity

under 42 U.S.C. § 20109(a)(1) and (2), when he: (a) reported Allen's unlawful instructions to Allen

himself, Cornelius Knox, Dewey [LNU], and David Mendez; and (b) refused to obey Allen's

unlawful order that violated UP policy and the FRA regulations; (2) UP knew that Goins engaged

in FRSA-protected activity; (3) Goins suffered an adverse action – he was terminated; and (4)

based on UP's own given reason for his termination there is direct evidence that Goins's protected

activity was a contributing factor in his termination and/or the circumstances are sufficient to raise

the inference that his protected activity was a contributing factor in his termination.  Accordingly,

Goins makes out a *prima facie* claim for unlawful retaliation under the FRSA.   *See Yowell v.*

*Admin Rev. Bd.*, 993 F.3d 418, 421 (5th Cir. 2021) (setting out elements of a *prima facie* of

retaliation case under the FRSA); *Walker v. Union Pac. R.R. Co., Inc.*, Civil Action No. 23-740,

2024 WL 4668160, at *7 (M.D. La., Nov. 4, 2024) (concluding that the plaintiff had made out a

*prima facie* case in his  FRSA retaliation claim against UP); *Taylor v. Union Pac. R.R. Co., Inc.*,

Civil Action No. 18-1110-SDD-EWD, 2021 WL 952410, at *4-6 (M.D. La. Mar. 12, 2021) (same);

*Thomas v. Union Pacific Railroad Co.*, 203 F. Supp.3d 1111, 1120-26 (D. Or. 2016) (same); *Ray*

*v. Union Pacific Railroad Co.*, 971 F. Supp.2d 869, 882-88 (S.D. Iowa) (same).

37.     As noted above, under the FRSA, once a claimant makes out a *prima facie* case,

the burden switches to the respondent to "demonstrate[] by clear and convincing evidence, that [it]

would have taken the same unfavorable personnel action in the absence of that behavior. 49 U.S.C.

§ 42121(b)(2)(B)(ii).  If the respondent can make that showing, then it is not liable.  In this case,

however, as with several other FRSA retaliation cases it has been a party to, UP cannot make that

showing.  *See, e.g., Taylor*, 2021 WL 952410, at *9-11 (denying UP's motion for summary

judgment in an FRSA retaliation case and rejecting UP's argument that it would have terminated the plaintiff regardless of his FRSA-protected activity; *Thomas*, 203 F. Supp.3d at 1126-28 (same); *Ray*, 971 F. Supp.2d at 889-90 (same).

38.    Indeed, UP's own given reason for termination directly implicates the very protected activity that Goins's engaged in under the FRSA.  And, for all intents and purposes, Allen's and Knox's texts constitute smoking gun proof that UP fired Goings in violation of the FRSA. *See* Exs. 5-8.  As such, UP is liable to Goins for FRSA-prohibited retaliation. *See, e.g., Taylor v. Union Pac. R.R. Co., Inc.*, Civil Action No. 18-1110-SDD-EWD, 2023 WL 2612611 (M.D. La. Mar. 23, 2023) (noting that jury awarded the prevailing plaintiff in an FRSA retaliation case against UP $1,035,349.36 in damages and that the court awarded another $150,518.75 in attorney's fees).

## DAMAGES

39.    As noted above, after Goins was terminated, he was unemployed for about a month and then found work at FGF Bakery in San Antonio earning $13.00 an hour or approximately $27,040 per year.  There is no chance he can obtain a new job that pays remotely close to what he would have earned at UP.  The whole reason he moved from North Carolina to San Antonio, Texas, was for the UP job, so his being fired has devastated him both emotionally and financially.  Goins has suffered, and will continue to suffer, substantial lost wages and benefits.  Goins has also suffered, and will continue to suffer, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.  Pursuant to the FRSA, Goins requests backpay, an order of reinstatement or front-pay, compensatory damages, attorneys' fees, and costs. *See* 42 U.S.C. § 20109(e)(2).

12

40.    Front pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to retirement. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 n. 8 (5th Cir. 1996) ("[f]ront pay is usually invoked when reinstatement is impracticable and is calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages.") (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement."); *Dell, Inc. v. Wise*, 424 S.W.3d 100, 112 (Tex. App.—Eastland 2013, no pet.) (in determining the front pay award, "[a]bsent evidence to the contrary, it should be assumed that an illegally discharged employee would have continued working for the employer until retirement."). Front pay is awarded when reinstatement is not feasible due to, among other reasons, hostility between the parties. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490 (5th Cir. 2007) (stating that "record suggests some lingering animosity between the parties" because, among other things, plaintiff alleged that defendant's "management attempted to black-ball him in the industry"); *Junaid v. McHugh*, No. 2:11–CV00226, 2013 WL 321567, at *1 (S.D. Tex. January 28, 2013) (collecting cases which demonstrate that reinstatement is not feasible when there is hostility between the parties). Here, UP threatened to blackball Goins in the industry to make his life "a living hell" if he returned to UP. *See* Exs. 5 and 6. As such, the Court should award front pay rather than reinstatement, in an amount running until Goins's anticipated retirement. *See, e.g., Bell Helicopter v. Burnett*, 552 S.W.3d 901, 921-23 (Tex.App. – Fort Worth 2018, pet denied) (affirming an award of twenty-four years of front pay to a plaintiff who prevailed in his discrimination case and affirming the final

13

total award of $864,420.51 to the plaintiff); *Tex. Dep't of Pub. Safety v. Williams*, No. 03-08-00466-CV, 2010 WL 797145, at *9 (Tex. App.—Austin Feb. 19, 2010, no pet.) (mem. op.) (affirming an award of eighteen years of front pay and explaining that a factfinder could have reasonably found that the Plaintiff would have remained with the employer for eighteen years, until the end of his career); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (affirming front-pay award of approximately ten years); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 88 (3rd Cir. 2009) (holding that district court did not abuse its discretion in awarding plaintiff front-pay for ten years); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 79 (2d Cir. 2004) (affirming front-pay awards of nine to twelve and one-half years), *vacated on other grounds sub nom KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148 (9th Cir. 1999) (affirming an eleven-year front pay award); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 574 (7th Cir. 1995) (holding that ten-year front-pay award did not constitute an abuse of discretion); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) (holding that a ten year front-pay award did not constitute an abuse of discretion).

41.    UP acted with malice and reckless indifference to Goins's federally protected FRSA rights in terminating his employment, threatening to blacklist him in the industry, and threatening retaliation against him in writing, because of his legally protected activities under the FRSA (Texts from Allen to Goins of 04/11/2025, Ex. 5; Texts from Knox to Goins of 04/15/2025, Ex. 6). Despite its own employees' written admissions of guilt and threats against Goins, UP's Corporate office tried to cover up its illegal retaliation against Goins by performing a sham investigation of his complaint, and issuing a false, self-serving conclusion that it did nothing wrong (Notice from UP to Goins of 05/22/2025, Ex. 9). It then submitted an SOP to OSHA that is filled

with knowingly false statements. UP's attempted fraudulent cover up is just as bad as its crime. Punitive damages are necessary to punish UP for its outrageous actions and deter it from doing this again to another innocent victim like Goins. Accordingly, Goins also seeks an award of punitive damages not to exceed $250,000, and all other relief to which he is justly entitled under the law. *See* 42 U.S.C. § 20109(e)(3).

## JURY DEMAND

42.    Goins demands a jury trial as provided for in the FRSA. *See* 49 U.S.C. §20109(d)(3).

## PRAYER

Goins asks that the Court issue citation for UP to appear and answer, and that he be awarded a judgment against UP for the following:

      a.    Actual damages;

      b.    Reinstatement to his former position or front-pay (and, as explained above, Goins asserts front-pay is the correct alternative in this case);

      c.    Compensatory damages for past and future mental anguish and other compensatory damages as set forth herein;

      d.    Punitive damages of $250,000;

      e.    Attorneys' fees;

      f.    Court costs; and

      g.    All other relief to which Goins is entitled.

Respectfully submitted,

OBERTI SULLIVAN LLP

By:   s/ Mark J. Oberti
      Mark J. Oberti
      Texas Bar No. 00789951
      Southern District ID. No. 17918
      712 Main Street, Suite 900
      Houston, Texas 77002
      (713) 401-3555 – Telephone
      (713) 401-3547 – Facsimile

      ATTORNEY-IN-CHARGE FOR PLAINTIFF

16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ALPHONSO GOINS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. __  _____ |
| | § | |
| UNION PACIFIC RAILROAD COMPANY | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AFFIDAVIT OF ALPHONSO GOINS

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

On this day, Alphonso Goins appeared before me, the undersigned authority, who upon his oath, deposes and states:

1. I am over the age of 21, competent to make this affidavit, and have personal knowledge that everything stated herein is true and correct.

2. I have read Plaintiff's Sworn Original Complaint in this case. Unless otherwise indicated as being on "information and belief," the statements under the heading "Factual Background" in Plaintiff's Sworn Original Complaint in this case are all true and correct on my personal knowledge. Further, the documents attached to Plaintiff's Sworn Original Complaint as exhibits are true and correct copies of their originals.

3. Further, Affiant sayeth naught.

ALPHONSO GOINS

17

SUBSCRIBED AND SWORN TO before me on this the ___ day of October 2025, certify which witness my hand and seal of office.



Notary Public in and for
The State of TEXAS
Printed name: Darwin Richardson
Notary ID: 133292300

**DARWIN RICHARDSON**
Notary Public, State of Texas
Comm. Expires 08-25-2029
Notary ID 133292300

18